UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TAMARA L. KEHOE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. 3:08-CV-62 WL (CAN) |
| ) | |
| 1st SOURCE BANK HEALTHCARE ) | |
| BENEFITS PLAN, ) | |
| ) | |
| Defendant. ) | |

**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON BEHALF OF DEFENDANT 1ST SOURCE BANK HEALTHCARE BENEFITS PLAN**

This is an ERISA wrongful denial of benefits case. Plaintiff was an employee at 1st Source Bank and a participant in the 1st Source Bank Healthcare Benefits Plan ("Plan"), which is a self-funded ERISA healthcare benefits plan. Under the terms of that Plan, Defendant was given the authority and discretion to approve or deny requests for reimbursements of medical benefits. Defendant denied Plaintiff's request for reimbursement of approximately $30,000 incurred and Plaintiff filed this lawsuit to recover those benefits.

Plaintiff argues that there was a more reasonable interpretation of the Plan and the benefits should have been paid based on Plaintiff's alternative interpretation. Under well-established 7th Circuit precedent, whether Plaintiff or this Court can posit an alternative interpretation is immaterial to whether the Plan had the authority and discretion to deny Plaintiff's request for reimbursement. Instead, it is only if this Court determines that the Plan's

1

decision was arbitrary and capricious may it reverse the Plan's decision. After considering all of the factual evidence in the light most favorable to Plaintiff Tamara Kehoe, this is not a case where the Plan failed to exercise appropriate discretion. As a result, summary judgment should be granted in favor of the Plan because there is no genuine issue of material fact.

## STATEMENT OF MATERIAL FACTS

On the evening of July 28, 2007, Tamara Kehoe consumed alcohol while in her home. *See* Amended Joint Stipulated Facts for Summary Judgment ("SJ Facts"),[1] ¶¶1, 2; *see also* Plan000073.[2] At some point in the evening, Ms. Kehoe went to bed. SJ Facts, ¶2; *see also* Plan000073. At some point in the night, she got up out of bed and walked to her bathroom. SJ Facts, ¶2. In doing so, she fell down on her face and hands, injuring herself. *Id.*

Ms. Kehoe was admitted into the emergency room department at Memorial Hospital in South Bend, IN, at approximately 3:30AM on July 29, 2007 to have her injuries evaluated. *Id.*, ¶3; Plan 000101 (Emergency Department Triage form showing Arrival Time). According to the "diagnostic impression" of her at the hospital, she had suffered a "forward face fall on the face and outstretched both arms with bilateral colles fractures and nasal fracture in a patient who has had a significant amount of alcohol consumption." Plan000099.

At some point during her examination, her blood alcohol level was tested and was found to be 0.128. SJ Facts, ¶4; Plan000099. A number of X-rays were taken, and doctors determined that her injuries included a fracture of the distal nasal vein, fracture of the distal left radius, fracture of the left ulnar styloid process, fracture of the distal right radius and fracture of the right

---

[1] Many of the facts cited in the Plan's Brief in support of its Motion for Summary Judgment come from the parties' Amended Joint Stipulated Facts for Summary Judgment, filed July 30, 2008 (Doc. No. 26).

[2] The parties have stipulated to the admissibility of the administrative record related to Kehoe's claim. See Joint Stipulation Regarding Admissibility of Documents for Summary Judgment( Doc. No. 25). It has been Bates labeled Plan000001 to Plan000129 and is attached hereto as Exhibit 1.

ulnar styloid process.  SJ Facts, ¶5; Plan000103-09.  This means that, as a result of falling while walking to the bathroom in her home, she broke both bones in each of her wrists and her nose.

Ms. Kehoe was treated and released at approximately 10:55AM on July 29, 2007. Plan000110.  As part of her discharge instructions, she was instructed to have "no alcohol," (Plan000110) and informed that "the consumption of alcohol would delay any repair" of her injuries.  Plan000099.

Ms. Kehoe continued to receive treatment for these injuries from July 29, 2007 through November 5, 2007.  SJ Facts, ¶6.  The total expenses for the treatment of her injuries through the filing of her Complaint (and for which she has submitted claims for benefits to date) were in excess of $30,000.  SJ Facts, ¶6.  The Complaint alleges they were $30,982.18.  (Compl. ¶ 8).

At the time of her injury, Ms. Kehoe was a participant in the Plan which is a self-funded ERISA healthcare benefits plan.  SJ Facts, ¶¶7-8.  The administrator and fiduciary of the plan is 1st Source Bank.  *Id.*, ¶9.  Certain third-party administrative functions of the Plan have been delegated to a third-party administrator, North America Administrators, L.P.  *Id.*

Ms. Kehoe submitted a number of claims to have her bills for her medical treatment paid for by the Plan.  *Id.*, ¶10.  The Plan denied coverage of Kehoe's injuries because her actions fell under the Plan's exclusion for civil disturbances/crime which excludes "[c]harges resulting from an illness or injury incurred while under the influence of alcohol or illegal drugs as evidenced by a blood alcohol level equal to or in excess of the legal amount allowed in the state where the injury occurs or any other drug or alcohol screening test."  *Id.*, ¶11; Plan000017 (quoting Section 2.d(8) of the Plan).  The Plan came to this conclusion because Kehoe's blood alcohol level of 0.128 based on testing she received after she was admitted to the hospital.  SJ Facts, ¶12.

Thereafter, Ms. Kehoe, through her counsel, appealed these denials and thereby exhausted her internal administrative remedies under the Plan. SJ Facts, ¶13; Plan000073-74. The Plan denied her claims for benefits by a letter from North America Administrators on March 19, 2008. SJ Facts, ¶14; Plan000126. The Plan's basis for affirming its prior denials of Ms. Kehoe's claims for benefits was again the Plan exclusion (Section III.A.2(d)(8)) which excludes charges "resulting from an illness or injury incurred while under the influence of alcohol or illegal drugs as evidence by a blood alcohol level equal to or in excess of the legal amount allowed in the state where the injury occurs or any other drug or alcohol screening test." Plan000126. Ms. Kehoe then filed the complaint in this matter appealing the Plan's denial of her claim for benefits.

## SUMMARY JUDGMENT STANDARD

A court must grant summary judgment when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). All reasonable inferences are viewed in the light most favorable to the nonmoving party, but the nonmoving party *must present sufficient evidence* on which a trier of fact could reasonably find for it, or summary judgment will be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

To overcome a motion for summary judgment, the nonmoving party cannot point the Court to a mere scintilla of evidence in support of its position, but must present sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Id.* In order for a dispute to be "material," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Abe's Free Flow, Inc. v. City of Mishawaka*, 55 F. Supp.2d 908, 911 (N.D. Ind. 1999). The "opposing party must 'go beyond the pleadings'

and 'designate specific facts showing that there is a genuine issue for trial.'" *Imhoff v. Kmart Stores of Indiana, Inc.*, 149 F. Supp.2d 559, 565 (N.D. Ind. 2001).  And, "[i]f no reasonable jury could find for the party opposing the motion, it must be granted." *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th Cir. 1995) (citing *Anderson*, 477 U.S. at 248).

When the parties file cross-motions for summary judgment, the same standard still applies to each party.  "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made."  *O'Regan v. Arbitration Forums, Ins.*, 246 F.3d 975, 983 (7th Cir. 2001) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).  In this context, however, what is "actually before the court is administrative review of the benefits decisions with the administrative records being the essential uncontested fact."  *Baker v. Physicians Health Plan of N. Indiana Group Health Plan*, 2007 U.S. Dist. LEXIS 48778, *24 (N.D. Ind. July 3, 2007) (quotation marks omitted).

## ARGUMENT

**I.    The Plan's decision to deny benefits must be affirmed unless it was "arbitrary and capricious."**

   A.   <u>The Governing Standard For Wrongful Denial of Benefit Cases</u>

Under the Employee Retirement Income Security Act ("ERISA"), if a plan administrator is given discretion under the terms of a plan to determine the benefit eligibility of an employee's claim, the standard of review of the administrator's decision to deny benefits is deferential. *Metropolitan Life Insurance Co. v. Glenn*, 128 S.Ct. 2343, 2350 (2008) ("*MetLife*").  In the Seventh Circuit, the decision to deny benefits must be affirmed unless the decision was "arbitrary and capricious."  *Dougherty v. Indiana Bell Telephone Co.*, 440 F.3d 910, 915 (7th Cir. 2006); *Steele v. Life Ins. of North America,* 507 F.3d 593 (7th Cir. 2007); *see also Firestone*

*Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  It has also been described as an "abuse of discretion standard."  *Ronald J. Lehn Declaration of Trust v. GE Pension Plan*, 2008 U.S. Dist. LEXIS 26425, *5 n.2 (C.D. Ill. Apr. 2, 2008).

This standard is viewed as "highly-deferential."  *Dougherty*, 440 F.3d at 915.  "Under the arbitrary and capricious standard, a plan administrator's decision should not be overturned as long as (1) 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome,' (2) the decision 'is based on a reasonable explanation of relevant plan documents,' or (3) the administrator 'has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'"  *Hess v. Hartford Life & Accident Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (quoting *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, 900 F.2d 1138, 1142-43 (7th Cir. 1990) (citations omitted); *see also Hess v. Reg-Ellen Machine Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005) (if "any reasonable interpretation of the plan" supports the denial, it should not be set aside); *Raybourne v. Cigna Life Insurance Co. of New York*, No. 07-C-4305, 2008 U.S. Dist. LEXIS 48341 (N.D. Ill. June 24, 2008); *Dougherty*, 440 F.3d at 917 ("Questions of judgment are left to the plan administrator.").  Basically, a denial should not be overturned unless the decision was "downright unreasonable."  *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 828 (7th Cir. 2004).

This "most deferential standard does not amount to a rubber stamp," but the fact that "another reasonable but different interpretation was possible" does not justify overturning the Plan's decision.  *Lehn*, 2008 U.S. Dist. LEXIS 26425, *6 (citing *Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 607 (7th Cir. 1999)); *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (reviewing court's function is not "to decide whether

we would reach the same conclusion as the Plan or even rely on the same authority."). The scope of that review is limited to the administrative record. *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004).

The Supreme Court recently affirmed the Seventh Circuit's deferential standard that courts must apply when reviewing denials of benefits in ERISA cases where the decisionmaker has discretionary authority. *MetLife*, 128 S. Ct. at 2348. The Court acknowledged that a Plan administrator who "both evaluates claims for benefits and pays benefits claims" has a technical conflict of interest. *MetLife*, 128 S. Ct. at 2348. That conflict of interest therefore is one of the factors for this Court to consider when determining whether the Plan's decision was "arbitrary and capricious."

It does not, however, change the standard of review from deferential review to *de novo* review. *MetLife*, 128 S. Ct. at 2350. The Court explicitly stated that it would not "adopt[] a rule that in practice could bring about near universal review by judges *de novo*" of "the lion's share of ERISA plan claims denials." *Id.* Instead, courts "continue[] to apply a deferential standard of review to the discretionary decisionmaking of a conflicted trustee." *Id.* At the same time, though, the reviewing judge must "take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." *Id.* The conflict thus is "but one factor among many that a reviewing judge must take into account" on a case-by-case basis in determining whether the administrator abused its discretion. *Id.* at 2351. As a result, the Court essentially confirmed that the Seventh Circuit's standard continues to be that a plan administrator's discretion to determine benefits eligibility is upheld unless it is arbitrary and capricious. *Accord Dougherty*, 440 F.3d at 915 ("the existence of a potential bias, a potential

7

conflict of interest, is not enough to dislodge our ordinary and most-deferential level of arbitrary-and-capricious review.").

>    B.  The Plan Confers Discretionary Authority On The Plan Administrator To Interpret The Plan, Its Terms, and the Facts With Respect to Eligibility; <u>Therefore, The Standard of Review of the Plan's Decision is Deferential.</u>

According to the Plan, the Plan Administrator has discretionary authority to interpret the Plan, its terms, and the facts with respect to a Plan participant's eligibility for benefits. There are no "magic words" required to entitle a coverage decision to review under the arbitrary and capricious standard. *Baker*, 2007 U.S. Dist. LEXIS 48778, *18. The "critical question" in determining whether the Plan confers discretionary authority is "whether the plan gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case." *Gutta v. Standard Select Trust Ins. Plans*, 2008 U.S. App. LEXIS 13461 (7th Cir. June 26, 2008) (quoting *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 639 (7th Cir. 2005)). In those situations, the abuse of discretion or arbitrary and capricious standard is applied. *Id.*; *Silcox v. Prudential Ins. Co. of Am.*, 2007 U.S. Dist. LEXIS 63085, *20-22 (N.D. Ind. Aug. 23, 2007) (citing *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 329 (7th Cir. 2000)).

The Plan provides plan participants with adequate notice that the Plan Administrator is vested with discretionary authority regarding all aspects of Plan interpretation and eligibility determination. Section VIII.A.1(e) states that:

> The Plan Administrator shall have the authority to administer the plan by its provisions and to decide all questions arising thereunder. This authority specifically includes, but is not limited to: (1) the discretion to interpret all provisions of the Plan, including eligibility provisions; (2) the discretion to apply all provisions of the Plan, including eligibility provisions; (3) the discretion to make factual determinations in respect to whether a claim is covered by the Plan; (4) the discretion to determine the type of benefits payable for a claim that has been determined to be payable; (5) the discretion to make all decisions regarding

8

management of Plan assets.  All determinations made by the Plan Administrator are final, conclusive and binding.

*See* Plan000042.

The Plan therefore sufficiently apprises plan participants that the Plan Administrator has the "discretion" to "interpret" and "apply" "all provisions of the Plan, including eligibility provisions." *Id.*  It also has "the discretion to make factual determinations" with respect to whether a claim is covered.  *Id.*  As a result, this Court should apply the abuse of discretion or arbitrary and capricious standard to the Plan's decision to deny Ms. Kehoe benefits.  The fact that 1st Source Bank is both the employer and the Plan Administrator, according to *MetLife*, and therefore the Plan has a technical conflict of interest does not change that standard of review. *MetLife*, 128 S. Ct. at 2348.

## II.     The decision to deny benefits to Ms. Kehoe according to the Plan's terms was not arbitrary and capricious.

The decision to deny Ms. Kehoe's benefits under the terms of the Plan was not arbitrary and capricious.  In fact, even under *de novo* review, this decision was consistent with the terms of the Plan and therefore correct.  As set forth in the March 19, 2008 letter to Ms. Kehoe's counsel, the Plan Administrator affirmed the original denial of Ms. Kehoe's claims for benefits based on the Plan's exclusion of such claims under Plan Section III.A.2(d)(8).  *See* Plan000126 (quoting relevant Plan section); *see also* Plan000017 (quoted Plan exclusion).  That exclusion states that "[b]enefits will not be payable for any of, but not strictly limited to, the following:

> **8. Civil disturbances/crime -** Charges incurred as a result of participation in a riot or civil disturbance or while committing or attempting to commit an assault or felony or taking part as a principal or as an accessory in illegal activities or illegal occupation. *Charges resulting from an illness or injury incurred while under the influence of alcohol or illegal drugs as evidenced by a blood alcohol level equal to or in excess of the legal amount allowed in the state where the injury occurs or any other drug or alcohol screening test.*

*See* Plan 000017 (emphasis added).

9

As the denial letter states, Ms. Kehoe's claims arose from services rendered in connection with Ms. Kehoe's "Fracture of radius and ulna," "Collus' fracture," and "other charges regarding after care of fracture." *See* Plan000126.  Medical records that the Plan requested indicated that Ms. Kehoe broke both bones in both wrists, as well as her nose, when she fell in her home after drinking.  SJ Facts, ¶5; Plan000103-09.  Those records also indicated that her "blood alcohol level was .128." *See* Plan000126; SJ Facts, ¶¶4, 12; Plan000099.  Because "[t]he state legal limit for Indiana is .08," *see* Plan000126, the Plan denied all charges related to her injury. *Id.*

Ms. Kehoe's claims related to her alcohol-induced injury were properly denied by the Plan.  Her claims are the result of an "injury incurred while under the influence of alcohol . . . as evidenced by a blood alcohol level equal to or in excess of the legal amount allowed in the state where the injury occurs or any other drug or alcohol screening test."  Ms. Kehoe drank what the Hospital later characterized as "a significant amount of alcohol" at some time during the evening of July 28, 2007. *See* Plan000099.  Then she went to bed.  Later that night, she got up, walked to the bathroom, and was sufficiently impaired that she fell face-first with such force that she broke both bones in both wrists and her nose.  At about 3:30AM, she was admitted into the emergency room at Memorial Hospital to have her injuries evaluated.  SJ Facts, ¶3; Plan 000101.  She was diagnosed as having had "a significant amount of alcohol consumption."  Plan000099.  According to X-rays, she had a fracture of the distal nasal vein, fracture of the distal left radius, fracture of the left ulnar styloid process, fracture of the distal right radius and fracture of the right ulnar styloid process.  SJ Facts, ¶5; Plan000103-09.

At some point no earlier than her admission time, her blood alcohol level was tested at the hospital and was found to be 0.128.  SJ Facts, ¶4; Plan000099.  She must have been visibly intoxicated because the medical notes indicate that she had "had a significant amount of alcohol

10

consumption." Plan000099.  This means that, no earlier than 3:30AM -- and therefore at least 3 ½ hours after she finished drinking the night before (assuming she was drinking as late as midnight) -- Ms. Kehoe remained sufficiently under the influence of alcohol that she had a blood alcohol level more than 50% above the legal limit in Indiana for any alcohol-related offense.³  In fact, under Indiana law, if a person is detained with a blood alcohol level of 0.128, that person would not be permitted to be released on her own recognizance.  A law enforcement agency encountering that person would be required to detain her at least four hours before releasing her into the general public.  Ind. Code § 34-33-1-6.  Logically, at the time Ms. Kehoe fell, her blood alcohol level was even higher than when she presented at the hospital, and when she was drinking it must have been even higher still.

Upon her discharge at around 10:55AM on July 29, 2007, she was specifically instructed to have "no alcohol," (Plan000110) and informed that "the consumption of alcohol would delay any repair" of her injuries.  Plan000099.

Under the circumstances, and applying the appropriately "deferential" standard of review, it was not an abuse of discretion for the Plan Administrator to deny Ms. Kehoe's claim for benefits related to the injuries she sustained.  The Plan excludes coverage for "[c]harges resulting from an illness or injury incurred while under the influence of alcohol."  *See* Plan 000017.  These claims clearly stem from an injury incurred while under the influence of alcohol.  Her injuries themselves demonstrate, in an almost *res ipsa loquitur* fashion, that she was impaired by the

---

³ The legal limit for operating a motor vehicle or a motorboat is .08.  Ind. Code § 9-30-5-1, § 14-15-8-8.  The legal limit for operating an aircraft is even stricter because there is no specified blood alcohol concentration required.  It is a Class B misdemeanor if a pilot operates an aircraft while merely "under the influence of liquor."  Ind. Code § 8-21-4-8.  This is similar to the legal limit for public intoxication where it is a Class B misdemeanor for a person to be in a public place in a state of intoxication.  Ind. Code § 7.1-5-1-3.  "Intoxication" can be determined by the individual's actions.  *See Henriott v. State*, 562 N.E.2d 1325, 1327 (Ind. Ct. App. 1990) (driving while intoxication conviction affirmed when blood alcohol level was below .10); *Atkins v. State*, 451 N.E.2d 55, 57 (Ind. Ct. App. 1983) (public intoxication conviction upheld where defendant was "unsteady on her feet, had an alcoholic odor about her breath and person, and was arrested due to her condition and actions at the scene.").

11

alcohol she consumed.  Furthermore, at the hospital (it is reasonable to infer that this was hours after she stopped drinking), her blood alcohol level was tested and found to be .128.  This is "equal to or in excess of the legal amount allowed" in Indiana as proscribed by any number of statutes.

Ms. Kehoe's only argument is that Indiana places no express legal limits on the amount of alcohol a person can consume in their home.  *See* Complaint, ¶13.  This argument unduly narrows the Plan Administrator's function.  The Plan Administrator's task was to determine whether her claims resulted from an "injury incurred while under the influence of alcohol." Even Ms. Kehoe does not dispute that this was the case.  The medical records confirm that a "significant amount of alcohol consumption" had taken place. Plan000099.  The Plan identifies one way to "evidence" whether a participant was under the influence of alcohol when her injuries were sustained, but the Plan does not exclude other means of determining how the injury arose.  Moreover, there are any number of legal limits related to the amount of alcohol a person can consume, and Ms. Kehoe exceeded them all.  In fact, there does not appear to be a legal limit in Indiana higher than .08, and therefore none as high as .128.   At most, Ms. Kehoe's argument is that there is an alternative reasonable interpretation of the Plan's exclusion which is not enough to overturn the Plan Administrator's denial of benefits.  *Olander*, 187 F.3d at 607.

In this way, her claim is similar to *Balthis v. AIG Life Insurance Company*, 5 Fed. Appx. 320 (4th Cir. 2001).  In that case, a plan participant died, and his brother filed an ERISA wrongful denial of benefits claim, as the beneficiary of the participant's life insurance policy.  At the time of the participant's death, he had a blood alcohol concentration of 0.16%.  He died on his couch after becoming ill due to alcohol ingestion.  The life insurance policy had an exclusion which stated:

12

> The Policy does not cover any loss caused in whole or in part by, or resulting in whole or in part from…the Insured Person being legally intoxicated under the applicable law of the jurisdiction where the accident occurred.

*Id.* at *4. The beneficiary argued that the exclusion only applied "if the decedent was committing an illegal act under the applicable law that involved intoxication." *Id.* The beneficiary argued that, "[b]ecause 'sleeping while intoxicated' is not illegal under North Carolina law," the exclusion should not apply. *Id.* at *5.

Even on *de novo* review, the Court held that the Plan's denial of the claim for benefits was proper. The Court concluded that "'legally intoxicated' simply means that the parties intended to look to the law of whatever state the accident occurred in, rather than set a uniform or precise standard of intoxication." *Id.* at *6. The Court compared the blood alcohol content of the participant to various legal limits in the state, including the blood alcohol concentration limit for operating a motor vehicle, a motorboat and an aircraft. The Court also compared the legal limit for public intoxication by looking to the state's definition of intoxication, which focused on impairment. The Court said that it "need not determine in this case which of the provisions of North Carolina law applies because under any or all of them the decedent was legally intoxicated." *Id.* at *7. As a result, the Court ruled in favor of the Plan and affirmed the denial of benefits pursuant to the Plan's exclusion for legal intoxication.

As in *Balthis*, the Plan Administrator need not ignore the existing medical records, and common sense, to conclude that Ms. Kehoe's claim arises from an injury incurred while under the influence of alcohol. Indiana imposes numerous limits on a person's activities after consuming alcohol, and Ms. Kehoe's blood alcohol level hours after she finished drinking exceeded them all. At a minimum, it was not "downright unreasonable" to conclude, as the Plan

did, that her injuries were incurred while under the influence of alcohol. *Dabertin*, 373 F.3d at 828.

The Plan's decision to deny Ms. Kehoe benefits was not arbitrary and capricious or an abuse of discretion. As a result, this Court should affirm the Plan Administrator's denial of Ms. Kehoe's claims for benefits under 29 U.S.C. §1132(a)(1)(B).

## CONCLUSION

Plaintiff's principal argument is that there was an alternative way Defendant could have interpreted its Plan. Even assuming that is the case, Plaintiff is not entitled to recover on its wrongful denial of benefits claim under well-established 7th Circuit precedent. A different interpretation that the Plaintiff likes better fails as a matter of law. *See Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 607 (7th Cir. 1999); *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004) (reviewing court's function is not "to decide whether we would reach the same conclusion as the Plan or even rely on the same authority."). Its decision to deny benefits was appropriate and not arbitrary and capricious. For these reasons, the Plan respectfully requests that the Court enter summary judgment in its favor and deny Ms. Kehoe's cross-motion for summary judgment, and dismiss her claim with prejudice.

Respectfully submitted,

BARNES & THORNBURG LLP


 s/ David R. Pruitt
Timothy J. Abeska
Brian E. Casey
David R. Pruitt
600 1st Source Bank Center
100 North Michigan
South Bend, IN   46601
Telephone: (574) 233-1171
tim.abeska@btlaw.com
brian.casey@btlaw.com
david.pruitt@btlaw.com

ATTORNEYS FOR DEFENDANT
1st SOURCE BANK HEALTHCARE PLAN

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2008, I served via CM/ECF, the **Brief in Support of Motion for Summary Judgment** on the following:

Clint Zalas, Esq.
Matthew J. Anderson
LEE, GROVES & ZALAS
205 West Jefferson Blvd., Suite 502
South Bend, Indiana 46617


By   s/  David R. Pruitt
       David R. Pruitt

SBDS01 BCASEY 283526v3